Barry I. Levy
Michael A. Sirignano
Justin A. Calabrese
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees
Insurance Company, GEICO Indemnity Company,
GEICO General Insurance Company and
GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE  COMPANY
and GEICO CASUALTY COMPANY,

Docket No.:

               Plaintiffs,

**Plaintiffs Demand a Trial
by Jury**

     -against-

MDAX, INC.,
URIYEL MIRZAKANDOV,
MULTI LVR, LLC,
ROSHEL MIRZAKANDOV
JOHN DOES "1" – "3" and
JOHN DOE COMPANIES "1" – "3",

               Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively, referred to hereinafter

as "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as

follows:

## INTRODUCTION

1.      This action seeks to recover more than $208,000.00 that Defendants wrongfully

have obtained from GEICO by submitting, and causing to be submitted, hundreds of fraudulent

claims seeking payment for durable medical equipment ("DME") and orthotic devices (e.g.

cervical collars, lumbar-sacral supports, electronic muscle stimulator units, egg crate mattresses,

etc.).  These goods purportedly were provided to individuals who were involved in automobile

accidents and were eligible for insurance coverage under GEICO insurance policies ("Insureds").

2.      The Defendants' fraudulent conduct includes, but is not limited to:

(i)     participating in a scheme with various No-Fault medical offices (the "Clinics") and their associated physicians and/or chiropractors ("practitioners") to dispense unnecessary DME and orthotics pursuant to fraudulent pre-determined protocols;

(ii)    unilaterally dispensing various forms of DME and orthotics without medical support or justification for the items purportedly dispensed;

(iii)   intentionally mischaracterizing the nature of the DME and orthotics provided and manipulating the reimbursement formulas for the goods so as to claim monies to which they were never entitled;

(iv)    agreeing to convert insurance and other payments into cash,which was then used to pay unlawful kickbacks to wholesale companies for inexpensive DME and orthotics and to the Clinics' representatives in exchange for the prescriptions; and

(v)     refusing to provide full and complete responses to GEICO's lawful requests for verification of the charges submitted to GEICO for No-Fault reimbursement.

3.      In addition, GEICO seeks a declaration that it is not legally obligated to pay more

than $472,000.00 in fraudulent claims that have been submitted through MDAX, Inc.

(hereinafter, "MDAX") because:

(i)     Defendants MDAX and Uriyel Mirzakandov ("Mirzakandov") made false and fraudulent misrepresentations to GEICO

concerning the maximum permissible charges for the DME and orthotic devices they allegedly provided to Insureds in order to obtain from GEICO payment under the New York "No-Fault" laws to which they are not entitled;

(ii)     Defendants MDAX and Mirzakandov purchased inexpensive and arguably counterfeit DME and orthotics, purportedly provided the devices to GEICO insureds and misrepresented the nature and quality of the products by submitting to GEICO inflated charges with improper reimbursement codes;

(iii)    Defendants MDAX and Mirzakandov made false and fraudulent misrepresentations to GEICO by submitting charges for DME and orthotic devices that never were dispensed to Insureds;

(iv)    The charges submitted by Defendants MDAX and Mirzakandov are the results of unlawful kickbacks with the Clinics which are the sources of the prescriptions; and

(v)     Defendants MDAX and Mirzakandov regularly failed and/or refused to adequately provide full particulars of the nature of the DME and orthotic devices they purported to have supplied to Insureds.

4.     The Defendants fall into the following categories:

(i)     Defendant MDAX is a New York corporation that purports to purchase DME and orthotic devices from various wholesale DME and orthotic device dealers. MDAX then purportedly dispenses the equipment and orthotics to Insureds while systematically submitting fraudulently inflated claims to GEICO and other New York automobile insurers.

(ii)     Defendant Mirzakandov owns and controls MDAX and submitted to GEICO and other New York automobile insurers fraudulently inflated bills seeking reimbursement for DME and orthotics purportedly dispensed by Mirzakandov through MDAX.

(MDAX and Mirzakandov are hereinafter collectively referred to as the "Retail Defendants").

(iii)    Defendants Multi LVR, LLC ("Multi LVR") and John Doe Companies "1" – "3" are New York companies with no legitimate business purpose other than converting insurance and other payments to cash that was used by the Retail Defendants to pay for

DME and orthotics as well as for the prescriptions they used to support their fraudulent claims.

(iv)     Defendant Roshel Mirzakandov ("Roshel") owns Multi LVR and John Does "1" – "3" own John Doe Companies "1" – "3" and each agreed to participate in the fraudulent scheme perpetrated by the Retail Defendants.

(Multi LVR, Roshel, John Doe Companies "1" – "3" and John Does "1" – "3" are collectively hereinafter referred to as the "Shell Company Defendants").

5.     As discussed below, the Defendants at all times have known that the claims for DME and orthotic devices submitted to GEICO were fraudulent because: (i) the equipment was prescribed and dispensed pursuant to fraudulent pre-determined protocols established by the Retail Defendants and laypersons at the Clinics without regard to medical necessity; (ii) most of the prescriptions were the byproducts of unlawful kickbacks with the layperson owners of the Clinics that were the source of the prescriptions; (iii) the claims misrepresented the nature and quality of the DME and orthotic devices that were actually provided; (iv) the charges intentionally were inflated based upon an exploitation of the payment formulas set forth in New York's "No-Fault" laws; and (v) in many cases, the goods and related services billed to GEICO never were actually provided to the Insureds in the first instance.

6.     As such, the Retail Defendants do not now have – and never had – any right to be compensated for their claims for DME and orthotic devices.  The chart attached hereto as Exhibit "1" sets forth a representative sample of more than 2300 fraudulent claims that have been identified to-date that the Retail Defendants submitted, or caused to be submitted, to GEICO. The Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry began in 2015, has continued uninterrupted since that time, and resulted in damage to GEICO of more than $208,000.00

## THE PARTIES

### I.   Plaintiffs

7.     Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

### II.   Defendants

8.     MDAX is a New York corporation with its principal place of business in Brooklyn, New York.  Pursuant to generic prescriptions generated at various No-Fault medical "mills", MDAX purported to provide patients with various forms of DME and orthotics.

9.     Most of the equipment provided however was inexpensive, poor quality products that are available to the public for mere fractions of MDAX's charges.   MDAX was incorporated on March 4, 2015 and from that time through August 3, 2016, MDAX and Mirzakandov knowingly submitted more than $1.2 million in fraudulent claims to GEICO.  In addition to submitting the fraudulent claims, MDAX has filed and continues to file costly collection lawsuits and arbitrations against GEICO seeking reimbursement on the fraudulent claims despite having no right to reimbursement.

10.     Defendant Mirzakandov is a citizen of New York and at all relevant times owned and controlled Defendant MDAX.

11.     Multi LVR is a New York limited liability company with its principal place of business at 139-09 84 Drive, Briarwood, New York.   Multi LVR was organized in New York on or about October 23, 2015 and has been used by the Retail Defendants as a "clearinghouse" for payments that were converted to cash or some other form and used by the Retail Defendants

to pay their wholesalers and the Clinics for the hundreds of prescriptions they used to support their fraudulent claims.

12.     Defendant Roshel resides in and is a citizen of New York.  Roshel is the sole member and managing member of Multi LVR, at all relevant times controlled and operated Multi LVR's operations.

13.     John Doe Companies "1" – "3" are New York companies or corporations with their principal places of business in New York.  John Doe Companies "1" – "3" were used by the Retail Defendants as "clearinghouses" for payments that were converted to cash or some other form and used by the Retail Defendants to pay their wholesalers and the Clinics for the hundreds of prescriptions they used to support their fraudulent claims.

14.     John Does "1" – "3" reside in and are citizens of New York and are the managing members or owners of John Doe Companies "1" – "3" and at all relevant times controlled and operated John Doe Companies "1" – "3" in furtherance of the fraudulent scheme.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

16.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

I.     **An Overview of the No-Fault Laws and Licensing Statutes**

17.     GEICO underwrites automobile insurance in the State of New York.

18.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.) (Collectively referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

19.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

20.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3"). In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

21.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3s and HCFA-1500 Forms submitted by healthcare providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

7

22.     Similarly, all HCFA 1500 (CMS-1500) Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

## II.     Regulations Governing Maximum Reimbursement for Durable Medical Equipment and Orthotic Devices

23.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes.  Although not always medically necessary, durable medical equipment often dispensed include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), hot/cold packs, infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("Tens units"), thermophores (electrical moist heating pads), cervical traction units, and whirlpool baths.

24.     Orthotic devices, a subgroup of DME, are instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of joints, spine, or limbs. These devices come in direct contact with the outside of the body, and include such items as cervical collars (i.e., "whiplash" collars), lumbar supports, knee orthotics, ankle supports, wrist braces, and the like.

25.     The No-Fault Laws set forth maximum charges that may be submitted by healthcare providers for DME and orthotic devices. One of the primary purposes in limiting the maximum charges for DME and orthotic devices is to ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME and orthotic device

charges. In a June 16, 2004 Opinion Letter, the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME and orthotic device charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

> (A copy of the June 16, 2004 Opinion Letter is attached as Exhibit "2.")

26.     Effective October 6, 2004, the maximum permissible charge for DME and orthotic devices is the fee payable for such DME and orthotic devices under the New York State Medicaid program at the time such DME and orthotic devices are provided. See 11 N.Y.C.R.R. (Appendix 17-C, Part F (a) (effective Oct 6, 2004)).

27.     If the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable shall be the lesser of the acquisition cost (i.e., the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent, or the usual and customary price charged to the general public. See 11 N.Y.C.R.R. (Appendix 17-C, Part F (a) (effective Oct. 6, 2004)).

28.     With the subsequent enactment of 12 N.Y.C.R.R. § 442.2 (2011) it was explained that there was no further need for Appendix 17-C Part F since No-Fault follows the Workers' Compensation Fee Schedule and therefore No-Fault could adopt that fee schedule. As a result, 11 N.Y.C.R.R. 68 Appendix 17-C, Part F was repealed. Nevertheless, the language in the Workers' Compensation Fee Schedule as it relates to durable medical states:

> (a) The maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided... If the New York State Medicaid program

has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:

> (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or

> (2) the usual and customary price charged to the general public.

29.     Insurers such as GEICO are entitled to receive a proper proof of claim. See 11 N.Y.C.R.R. § 65-3.8(f). To be eligible for payment, a claim seeking reimbursement for DME and/or orthotic devices must include a description of the "full particulars of the nature and extent" of the items and services for which payment is sought. See 11 N.Y.C.R.R. § 65-1.1.

## III.    An Overview of the Defendants' Fraudulent Scheme

30.     The Defendants perpetrated a scheme through which the Retail Defendants, through MDAX, submitted to GEICO approximately $1.2 million in fraudulent claims, seeking reimbursement for DME and orthotic devices.

31.     To date, the Retail Defendants have wrongfully obtained more than $208,000.00 from GEICO and there are more than $472,000.00 in additional fraudulent claims that have yet to be adjudicated and remain unpaid.

32.     The fraudulent scheme perpetrated by the Retail Defendants involves the Retail Defendants, various DME wholesale companies and the participation of medical offices and practitioners who prescribe or purportedly prescribe DME and orthotics for GEICO Insureds.

33.     Upon information and belief, the Retail Defendants paid kickbacks to various multi-disciplinary No-Fault Clinics, controlled by unlicensed laypersons, which purport to provide treatment to high volumes of Insureds.

34.    As part of the fraudulent scheme, and in exchange for the kickbacks, the operators/managers of the Clinics caused to be prescribed large amounts of DME and orthotic devices that purportedly were supplied to Insureds by the Retail Defendants.

35.    The prescriptions were never given to the Insureds, but as part of the scheme, they were routed directly to the Retail Defendants to ensure that the Insureds did not fill the prescriptions with legitimate DME/orthotic device retailers.

36.    In exchange for the kickbacks, the clinic operators/managers caused to be prescribed DME and orthotic devices that *were not* covered by the New York State Medicaid fee schedule, thus enabling the Retail Defendants to seek reimbursement on the DME and orthotic devices based on their purported acquisition costs with respect to such goods.

37.    To the extent that the Clinic operators/managers caused to be prescribed DME and orthotic devices that *were* covered by the New York State Medicaid Fee Schedule, they ensured that the prescriptions were written in a generic, non-descript manner, thus enabling the Retail Defendants to: (i) misrepresent the nature and quality of the items intended for the patient and (ii) misrepresent the nature and quality of the items that the Retail Defendants actually dispensed so as to claim entitlement to a higher fee payable.

38.    In order to maximize the fraudulent charges that they could submit to GEICO and other insurers, the Retail Defendants sought out various DME wholesale companies which sold to the Retail Defendants, inexpensive and sub-standard equipment.

39.    Upon information and belief, the Retail Defendants entered into secret agreements with the various DME wholesale company representatives whereby – in exchange for a share in the profits of the fraud – various DME wholesale companies provided the Retail Defendants with

counterfeit, low-quality DME at the lowest possible prices which were negotiated by the Retail Defendants.

40.     The Retail Defendants then sought from GEICO and other insurers, the maximum reimbursable fee for many of the goods – "kicking back" a portion of the proceeds to the various wholesale companies.

41.     Although the Retail Defendants appear to have paid the invoice amounts and nothing more, the payment methodology was merely a façade because on many occasions the wholesale companies converted the checks to cash through various methods and returned a substantial portion to the Retail Defendants while keeping a portion for themselves.

42.     On other occasions, the Retail Defendants made payments to the Shell Company Defendants that were disguised as "loans", which were then, upon information and belief, converted into cash and "rebated" to the Retail Defendants who in turn used a portion of the monies to pay the kickbacks to the wholesale companies.

43.     The Retail Defendants could afford to rebate to the wholesale companies a portion of the proceeds they retained from GEICO because the difference between their cost for the goods and the maximum reimbursable fee for the items were immense.

44.     Upon information and belief, some of the proceeds were used by the Retail Defendants to "purchase" prescriptions from the Clinics (i.e., the kickbacks) and to maintain a steady flow of cash to facilitate the scheme.

45.     Much of the DME and orthotics purchased by the Retail Defendants from the various wholesale companies were inexpensive products manufactured in China, then imported, packaged and distributed to No-Fault DME retail companies, like the Retail Defendants.

46.     In many cases, these products were counterfeit products and cheap knock-offs of legitimate products that the Center for Medicare & Medicaid Services ("CMS") have analyzed and assigned a particular Healthcare Common Procedure Coding System Code ("HCPCS Code").

47.     The various wholesale companies ensured that the faux products were manufactured and "branded" with particular HCPCS Codes and imported into the United States for distribution

48.     The various DME wholesale companies then flooded the markets with the substandard devices, and sold the goods to retail companies, including the Retail Defendants.

49.     The Retail Defendants dispensed the goods using what purported to be legitimate HCPCS codes and demanded exorbitant fees for the products.

50.     Nevertheless, the Retail Defendants systematically represented that the inexpensive DME obtained from the various DME wholesale companies and purportedly dispensed to GEICO Insureds were high-quality and expensive products by submitting charges that far exceeded the true value of the products.

51.     The charges are so outrageous that no reasonable patient would ever pay the exorbitant prices for the substandard devices – had the patients been given the opportunity to choose their own pharmacy or retailer in the first instance.

52.     The Retail Defendants then created and submitted thousands of bills that deliberately omitted any meaningful information regarding the DME and orthotic devices, including the manufacturer, make and model of the DME and orthotic devices that the Retail Defendants purportedly dispensed to Insureds.

53. The Retail Defendants' creation and submission of such generic billing prevented GEICO and other insurers from identifying the manufacturer, make and model of the DME and orthotic devices and concealed the fact that: (i) the DME and orthotic devices dispensed by the Retail Defendants, to the extent that they were provided at all, were inexpensive low-quality products that cost a mere fraction of what was represented; (ii) the Retail Defendants, in virtually every instance, charged GEICO and other insurers far more than the maximum permissible amounts for the DME and orthotic devices that were supplied; and (iii) the Retail Defendants frequently billed GEICO and other insurers for DME and orthotic devices they never supplied in the first instance.

54. To further conceal the scheme, the Retail Defendants also failed to provide GEICO and/or refused to respond to repeated requests made by GEICO seeking information such as meaningful wholesale invoices containing descriptions of goods provided (i.e., make, model and manufacturer), proof of payment and additional information that would be necessary to determine whether the charges submitted by the Retail Defendants were legitimate and the result of bona fide arms-length transactions between the Retail Defendants and the various DME wholesale companies.

## IV. Mirzakandov's and MDAX's Scheme to Defraud GEICO

55. Beginning in 2015, Mirzakandov entered into kickback arrangements with various multidisciplinary Clinics that almost exclusively treated No-Fault patients.

56. Upon information and belief, many of these medical Clinics are owned, operated and managed by non-physicians who direct the treatment and billing related to the medical practices that operate within the Clinic walls.

57.     In exchange for payments from Mirzakandov, the Clinic operators/managers directed their associated practitioners to: (i) to systemically prescribe large amounts of virtually identical DME and orthotic devices to Insureds, without regard to the Insureds' symptoms, and (ii) to issue generic prescriptions for DME and orthotic devices, omitting specific descriptions of the devices required so as to permit Mirzakandov to unilaterally select what DME or orthotic devices to dispense to Insureds.

58.     Nearly every patient who treated at the Clinics was prescribed the same or similar sets of DME and orthotics despite the seriousness of the related accident or the types of injuries sustained by the patients.

59.     Often times, even though the practitioners who evaluated the patients specifically recommended in their reports that particular items be given to the patients, the template prescription forms called for different pieces of equipment – some of which were never even considered or contemplated by the practitioners.

60.     In some instances, the Retail Defendants and the Clinic operators/managers merely replicated the practitioners' signatures or had someone at the Clinic, other than the practitioner, simply sign the form.

61.     In other instances, the Clinic operators/managers, as a condition to treating patients at the various Clinics, required the practitioner to sign prescription forms based solely on a review of MRI reports and nothing else.

62.     To justify the medical "necessity" of the devices, the Clinic operators/mangers ensured that the prescriptions for the additional products always coincided with MRI reports.

63.     For example, in almost each instance when an MRI of the lumbar spine yielded any positive results whatsoever, a prescription was provided to the Retail Defendants to support claims for one or more "custom" back braces.

64.     Similarly, in almost each instance when an MRI of the shoulder yielded any positive results whatsoever, a prescription was provided to the Retail Defendants to support claims for one or more "custom" shoulder braces.

65.     Likewise, in almost each instance when an MRI of the knee yielded any positive results whatsoever, a prescription was provided to the Retail Defendants to support claims for one or more "custom" knee braces.

66.     In almost each instance when an MRI of the cervical spine yielded any positive results whatsoever, a prescription was provided to the Retail Defendants to support claims for cervical traction units.

67.     Upon information and belief, the Retail Defendants then paid kickbacks to the Clinic operators/managers for the prescriptions that were prepared by the Clinic employees and transmitted directly to the Retail Defendants to support their claims.

68.     The fraudulent prescriptions were, in turn, used by the Retail Defendants to support the billing for the medically unnecessary equipment that they submitted to GEICO and to other automobile insurers.

69.     To facilitate the scheme, pursuant to their agreement with Mirzakandov (and in exchange for a share in the profits of the scheme and to support the efforts of Mirzakandov and MDAX to negotiate kickback arrangements with the Clinics), one or more of the various DME wholesale companies provided Mirzakandov and MDAX with the inexpensive DME.

70.     Upon information and belief, one or more of the various DME wholesale companies also provided the Retail Defendants with purchase invoices which sometimes included inflated prices for the goods.

71.     In the alternative, the invoices sometimes included discount prices for substandard and arguable counterfeit products.

72.     Although the Retail Defendants refused to submit the purchase invoices with their billing submissions, the Retail Defendants relied on the inflated prices as a basis for their calculation of charges they submitted to GEICO for reimbursement.

73.     In some instances, the Retail Defendants simply mischaracterized the nature of the items they purchased and purportedly dispensed to GEICO Insureds so as to claim reimbursement at a higher payable fee.

74.     In other instances, the Retail Defendants purchased inexpensive and arguably counterfeit orthotics and other devices from various specific wholesale DME and orthotic companies.

75.     Because such items purportedly are assigned a maximum reimbursable fee, the Retail Defendants negotiated with the various wholesale companies to ensure that they could purchase the poor-quality goods at the lowest possible rate.

76.     The Retail Defendants then charged the maximum reimbursable fee for each item which, in the aggregate, resulted in a virtual windfall for the Retail Defendants.

77.     For example, upon information and belief, the Retail Defendants paid one or more of the wholesale companies approximately $45.00 for back braces which the wholesale companies advertised as being approved for HCPCS Code L0627.

78. The Retail Defendants then submitted charges of $322.98 for each item purportedly dispensed to GEICO's Insureds – a profit of approximately $278.00 per Insured.

79. Similarly, upon information and belief, the Retail Defendants paid one or more of the wholesale companies approximately $65.00 for back braces which the wholesale companies advertised as being approved for HCPCS Code L0637.

80. The Retail Defendants then submitted charges of $844.13 for each item purportedly dispensed to GEICO's Insureds – a profit of approximately $779.00 per Insured.

81. Similarly, upon information and belief, the Retail Defendants paid one or more of the wholesale companies approximately $50.00 for knee braces which the wholesale companies advertised as being approved for HCPCS Code L1832.

82. The Retail Defendants then submitted charges of $607.55 for each item purportedly dispensed to GEICO's Insureds – a profit of approximately $458.00 per Insured.

83. Despite the fact they knew that legitimate products actually approved for the HCPCS Codes listed in their bills could not possibly have cost as little as they paid for the goods, the Retail Defendants used the HCPCS Codes provided by the wholesale companies as a basis for their representations that their claims for reimbursement were in accordance with the No-Fault laws when, in fact, they were not.

84. In fact, one of Retail Defendants' wholesalers of lumbar supports, Comfortland Medical, Inc. ("Comfortland"), and its principals, were named as defendants in a lawsuit filed by Aspen Medical Products, Inc. ("Aspen") in the United States District Court for the Central District of California. See, Aspen Medical Products et al. v. Comfortland Medical, et al., 8:16-cv-02001-AG-JCG. A copy of the Complaint is attached hereto as Exhibit "3".

85.     The Complaint asserted, among other things, claims for patent infringement relating to Comfortland's manufacture and sale of lumbar supports and back braces – the same braces purchased by the Retail Defendants and provided to GEICO Insureds.

86.     Upon information and belief, Comfortland was required to cease making, using or selling any lower back braces which utilize a dual cord tightening system – the same "custom" devices purchased by the Retail Defendants and purportedly provided to GEICO Insureds.

87.     Comfortland's principal, David Tsui ("Tsui") is no stranger to such misconduct.

88.     In fact, Comfortland is also the Retail Defendants' virtual exclusive wholesaler of cervical traction units.

89.     Comfortland and Tsui were named as defendants in a lawsuit filed by Posture Pro, Inc. (the true manufacturers of the traction units) in the United States District Court for the Central District of California.  See, Posture Pro, Inc. v. Comfortland Medical, Inc. et al., 8:13-cv-01252-JVS-AN.  A copy of the Complaint is attached hereto as Exhibit "4".

90.     The Complaint sought damages against Comfortland and its principals, for, among other things, patent infringement and unfair competition relating to the cervical traction units.  The lawsuit was filed in August of 2013 and settled just three (3) months later.

91.     Upon information and belief, the settlement required Comfortland to forfeit its complete inventory of traction units and to cease manufacturing and selling the counterfeit products that used the technology developed by Posture Pro, Inc.

92.     Nevertheless, the Retail Defendants regularly dispense the same cervical traction units provided to them by Comfortland.

93.     Upon information and belief, the Retail Defendants purchased each cervical traction unit from Comfortland for approximately $40.00 per unit.

94. The Retail Defendants then dispensed the counterfeit goods to GEICO Insureds and charged GEICO $502.63 for each device dispensed using HCPCS Code E0855 – a profit of approximately $463.00 per device.

95. Despite the fact they knew that legitimate products actually approved for the HCPCS Code listed in their bills could not possibly have cost as little as they paid for the goods, the Retail Defendants used the HCPCS Code provided by Comfortland as a basis for their representations that their claims for reimbursement were in accordance with the No-Fault laws when, in fact, they were not.

96. To further conceal their scheme, the Retail Defendants refused to provide, with their initial billing submissions, any information regarding the make, model or quality of the devices they purportedly dispensed to GEICO's Insureds.

97. Additionally, despite GEICO's specific requests for this information, the Retail Defendants refused to provide proof of their costs for the products thereby preventing GEICO from assessing the quality and nature of the goods.

98. Instead, the Retail Defendants simply submitted to GEICO purchase invoices which were intentionally redacted to conceal the Retail Defendants' true cost for the products and conceal the extent of their fraudulent conduct.

99. Despite GEICO right to the information, the Retail Defendants continuously take position that their acquisition cost for the items is irrelevant to the calculation of charges for many of the goods because such goods are assigned a maximum reimbursable fee.

100. The prices at which the Retail Defendants purchased the items is directly relevant to the nature and quality of the items dispensed to GEICO's Insureds and directly relevant to

whether the HCPCS Codes used by the Retail Defendants in conjunction with their charges are in fact proper.

101.   What is more, because they knew that simply converting insurance proceeds check into cash would raise suspicion from GEICO and other insurers, the Retail Defendants and Roshel and John Does "1" – "3" agreed to use Multi LVR and John Doe Companies "1" – "3" to disguise the kickbacks paid to the wholesale companies and the Clinics.

102.   Upon information and belief, once the Retail Defendants received the payments from GEICO and other insurers, they funneled a portion of the proceeds to the Shell Company Defendants.

103.   Upon information and belief, these payments were disguised as "loans" to the Roshel and the other Shell Company Defendants.

104.   Upon information and belief, the Shell Company Defendants had no legitimate business purpose other than to act as "clearinghouses" for the monies which were used by the Retail Defendants to pay the Clinic representatives for the prescriptions.

105.   For example, Multi LVR has no online presence, has no apparent storefront or business address and no identifiable connection to the DME business.

106.   Once the Shell Company Defendants received the payments from the Retail Defendants, the Shell Company Defendants converted the monies to cash and returned a significant portion of the monies to the Retail Defendants to support the fraudulent scheme.

C.   **The Retail Defendants' Manipulation of the Prescriptions and Their Fraudulent Billing Scheme**

107.   Not only did the Retail Defendants and Clinic operators/managers agree to design and implement the prescription protocols, but much of the DME and orthotics listed on the prescriptions and dispensed by the Retail Defendants (if at all) contravened each patient's

conservative treatment plans thus supporting the fact that the supplies were prescribed pursuant to predetermined protocols established by non-physicians as a means to generate profits.

108.     For example, although the associated physicians/chiropractors purportedly recommended for each patient a course of physical therapy which included stretching and bending to strengthen weakened areas of the back, knee and neck, the prescriptions invariably called for immobilizing devices such as lumbosacral supports, knee supports and cervical collars. Such devices would never be prescribed by an ordinary physician in a legitimate medical office environment.

109.     Additionally, pursuant to their agreement with Mirzakandov, the various DME wholesale companies provided Mirzakandov and MDAX with inexpensive DME and orthotics with HCPCS Codes that were used by and relied upon by Mirzakandov and MDAX as a basis for their representations that their claims for reimbursement were in accordance with the No-Fault laws when, in fact, they were not.

110.     In cases where the New York State Medicaid program *has not* prescribed a fee payable for a given item or a class of items, the Retail Defendants relied on fraudulently inflated wholesale/purchase prices to seek fees higher than what they were legally entitled by charging GEICO 150% of the inflated wholesale price.

111.     For example, the Retail Defendants submitted charges ranging from $424.91 to $598.64 for cold water circulation units (therefore representing its acquisition cost to be any anywhere between $283.00 and $399.00 per unit) without any information regarding the make, model, or manufacturer of the devices.  Representative samples of the bills, prescriptions and delivery receipts are annexed hereto as Exhibit "5".

112.   The water circulation units dispensed by the Retail Defendants however were inexpensive water jugs which are inexpensive units that are readily available to the general public for under $40.00.

113.   In cases where the New York State Medicaid program has prescribed a fee payable for a given item or a class of items, the Retail Defendants relied on the vague and generic prescriptions issued by the Clinics to misrepresent the nature of the items actually prescribed and furthermore misrepresent the item that the Retail Defendants purportedly dispensed so as to claim entitlement to a higher fee payable.

114.   For example, contemporaneous with initial evaluations the Retail Defendants submitted charges of $690.23 using HCPCS Code L3671 pursuant to prescriptions calling for "Shoulder-Brace – Custom Fitted".   Representative samples of the bills, prescriptions and delivery receipts are annexed hereto as Exhibit "6".

115.   The product represented by HCPCS Code L3671 is a *custom-fabricated* device that is made from scratch through molds specifically designed to fit a particular patient – not the generic, pre-fabricated items actually provided to the patients and which have a lesser established fee payable.

116.   The Retail Defendants also submitted charges of $155.22 using HCPCS Code E0272 pursuant to prescriptions calling for "egg crate mattresses".

117.   The product represented by HCPCS Code E0272 is a thick (five inches or more) foam mattress that is placed directly onto a bed frame as a *substitute for* a regular bed mattress – a more expensive, substantial product than the egg crate mattress overlays indicated on prescriptions and provided by the Retail Defendants.   Representative samples of the bills, prescriptions and delivery receipts are annexed hereto as Exhibit "7".

118.   The mattresses actually provided by the Retail Defendants should more properly be coded E0199 at a charge of $19.48, representing a dry mattress pad for mattress or an egg crate "overlay", as opposed to an actual mattress.

119.   The Retail Defendants also submitted charges of $153.13 using HCPCS Code E0184 pursuant to prescriptions calling for "egg crate mattresses".

120.   The product represented by HCPCS Code E0184 is a thick (five inches or more) gel mattress that is intended to prevent bed soars for patients who are bed-ridden – a more expensive, substantial product than the egg crate mattress overlays indicated on prescriptions and provided by the Retail Defendants.   Representative samples of the bills, prescriptions and delivery receipts are also annexed hereto as Exhibit "7".

121.   The mattresses actually provided by the Retail Defendants should more properly be coded E0199 at a charge of $19.48, representing a dry mattress pad for mattress or an egg crate "overlay.

122.   The Retail Defendants submitted charges of $101.85 using HCPCS Code E0274 pursuant to prescriptions calling for "bed boards".   Representative samples of the bills, prescriptions and delivery receipts are also annexed hereto as Exhibit "8".

123.   The product assigned HCPCS Code E0274 is an over-bed table that is used to eat on while relegated to a hospital (or other) bed.

124.   The bed boards actually dispensed by the Retail Defendants submitted are thin, folding cardboard slabs that are placed under a mattress.

125.   The bed boards actually dispensed by the Retail Defendants are not assigned a fee and therefore are reimbursable at the lower of the Retail Defendants' acquisition cost, plus 50%, or the usual and customary price to the general public.

126.    The Retail Defendants submitted charges of $502.63 for cervical traction units using HCPCS Code E0855 pursuant to prescriptions calling for "cervical traction unit/no frame/no stand", "c/s posture pump" or "cervical traction unit a/ pump".  Representative samples of the bills, prescriptions and delivery receipts are also annexed hereto Exhibit "9."

127.    Because the units dispensed by the Retail Defendants were generally inexpensive items, the Retail Defendants knowingly purchased from one or more of various DME wholesale companies, counterfeit cervical traction units and represented that the units were legitimate devices by billing under HCPCS Code E0855.

128.    In reality, the Comfortmax Cervical Hometrac devices dispensed by the Retail Defendants are not assigned a fee and therefore are reimbursable at the lower of the Retail Defendants' acquisition cost, plus 50%, or the usual and customary price to the general public – approximately $60.00.

129.    The Retail Defendants submitted charges for various other "custom-fitted" orthotics as explained earlier, but often times the items were never actually prescribed by the physicians or chiropractors.

130.    Instead, the Clinic operators/managers forged the prescriptions for such devices by either signing the practitioners' names directly onto the prescriptions or causing a photocopied representation of the physicians' signatures to be placed onto the forms.

131.    Although the Retail Defendants billed for these "custom-fitted" devices, neither Mirzakandov nor any representative of MDAX even measured or fitted many of GEICO's Insureds in the first instance.

132.    The Retail Defendants simply dispensed "one-size fits all" supports with adjustable Velcro straps that were given to them by the Clinic receptionists.

## V.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

133.   The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the provision of DME and orthotic devices to Insureds, and their actual submission of charges to GEICO.

134.   To induce GEICO to promptly pay the charges for the DME and orthotic devices, the Defendants have gone to great lengths to systematically conceal their fraud. Specifically:

(i)   The Retail Defendants deliberately failed to provide, with their initial billing submissions, purchase invoices illustrating the manufacturer, make, model, size, and quality of the goods, thereby concealing the true nature and quality of the products.

(ii)   The Retail Defendants secretly entered into kickback agreements with various Clinics whereby the Clinics provided the Retail Defendants with uniform, generic prescriptions that were used by the Retail Defendants to support their fraudulent claims.

(iii)   The Retail Defendants supported many of their claims with prescriptions that they knew were fraudulent.

(iv)   To the extent that the New York State Medicaid program established fees payable for a given class of DME and orthotic devices, the Retail Defendants knowingly mischaracterized the nature of the items so as to claim reimbursement at a higher fee payable.

(v)   The Retail Defendants knowingly and secretly dispensed substandard and arguably counterfeit products and submitted charges for such products using HCPCS codes they knew did not represent the true nature and quality of the products dispensed.

(vi)   Despite GEICO's lawful request for information, the Retail Defendants deliberately failed to provide purchase invoices illustrating the amounts that they actually paid for the DME and orthotic devices purportedly provided to GEICO Insureds.

(vii)   The Retail Defendants secretly wrote checks to various companies that converted those checks to cash that were paid to the wholesale companies for the DME and to the Clinic representatives for the prescriptions used by the Retail Defendants to support their claims.

135.    To induce GEICO to promptly pay the fraudulent charges, the Retail Defendants, routinely file expensive and time-consuming litigation against GEICO and other insurers if the fraudulent charges are not promptly paid in full, despite the fact that the Retail Defendants are aware that their billing and claims are fraudulent.

136.    GEICO is under a statutory and contractual obligation to promptly and fairly process claims within 30 days.  The documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations, omissions, and acts of fraudulent concealment described above, were designed to and did cause GEICO to justifiably rely on them.  As a proximate result, GEICO has incurred damages of more than $208,000.00 based upon the fraudulent charges.

137.    Because of the material misrepresentations and other affirmative acts taken by the Retail Defendants to conceal their fraud from GEICO, GEICO did not discover and should not reasonably have discovered that their damages were attributable to fraud until shortly before it filed this Complaint.

138.    GEICO maintains standard office practices and procedures that are designed to and do ensure that No-Fault claims denial forms or requests for additional verification of No-Fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

139.    In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through MDAX; (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through MDAX, yet failed to obtain compliance with the request for additional verification; or else (iii) the time in

27

which to deny the pending claims for No-Fault Benefits submitted through MDAX, or else to request additional verification of those claims, has not expired.

## FIRST CAUSE OF ACTION AGAINST MDAX
### (Declaratory Judgment Under 28 U.S.C. § 2201)

140.    GEICO repeats and realleges each and every allegation contained in Paragraphs 1 through 139 of this Complaint as if fully set forth at length herein.

141.    There is an actual case in controversy regarding more than $472,000.00 in fraudulent billing for DME and orthotic devices that allegedly have been provided to GEICO's Insureds.

142.    GEICO contends that MDAX has no right to receive payment for any pending bills they have submitted because:

> (i)     MDAX made false and fraudulent misrepresentations to GEICO concerning the maximum permissible charges for the DME and orthotic devices it allegedly provided to Insureds in order to induce GEICO into paying MDAX "No-Fault" reimbursement to which MDAX was not entitled;

> (ii)    MDAX's charges were and are the byproducts of improper agreements between the Clinics which permitted MDAX to dispense particular products to Insureds despite the fact that those goods were never prescribed for the patients and despite the fact that Mirzakandov is not and never has been a licensed chiropractor or physician;

> (iii)   MDAX made false and fraudulent misrepresentations to GEICO by submitting charges for DME and orthotic devices using HCPCS Codes they knew did not correspond to the items they purported to dispense to GEICO Insureds; and

> (iv)    Defendant MDAX failed and/or refused to adequately respond to GEICO's proper requests for additional verification, thereby breaching a condition of coverage and relieving GEICO of any obligation to pay the fraudulent claims.

147. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i) MDAX has no right to receive payment on any pending bills submitted to GEICO because it knowingly made false and fraudulent misrepresentations to GEICO concerning the maximum permissible charges for the DME and orthotic devices it allegedly provided to Insureds in order to induce GEICO into paying MDAX "No-Fault" reimbursement to which MDAX was not entitled;

(ii) MDAX has no right to receive payment on any pending bills submitted to GEICO because MDAX's charges were and are the byproducts of improper agreements between Clinics and the Retail Defendants which permitted MDAX to dispense particular products to Insureds despite the fact that those goods were never prescribed for the patients and despite the fact that Mirzakandov is not and never has been a licensed chiropractor or physician;

(iii) MDAX made false and fraudulent misrepresentations to GEICO by submitting charges for DME and orthotic devices using HCPCS Codes they knew did not correspond to the items they purported to dispense to GEICO Insureds; and

(iv) Defendant MDAX failed and/or refused to adequately respond to GEICO's proper requests for additional verification, thereby breaching a condition of coverage and relieving GEICO of any obligation to pay the fraudulent claims.

## SECOND CAUSE OF ACTION
### Against Mirzakandov and MDAX
### (Common Law Fraud)

148. GEICO repeats and realleges each and every allegation contained in Paragraphs 1 through 147 of this Complaint as if fully set forth at length herein.

149. Mirzakandov and MDAX intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for DME and orthotic devices.

150. The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)    In every claim for DME and orthotic devices for which the New York State Medicaid program has established fees payable, the representation that the goods represented in the billing actually were the goods intended to be provided to Insureds by the prescribing physicians.

(ii)    In every claim, concealment of the fact that the Retail Defendants knowingly provided inexpensive and arguably counterfeit products to Insureds so as to realize profits that far exceeded the profits it would have realized had they dispensed legitimate, quality products.

(iii)    In every claim, concealment of the fact that the Retail Defendants actually delivered all of the products to the Insureds when in reality, the Retail Defendants delivered the goods to the Clinic representatives who provided the Insureds with some, not all of the goods.

(iv)    In every claim, concealment of the fact that the DME and orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby Mirzakandov and MDAX paid kickbacks to the Clinics to induce the Clinics to direct their associated physicians to: (a) prescribe large amounts of medically unnecessary DME and orthotic devices and (b) write the prescriptions in a generic non-descript manner – both designed to permit Mirzakandov and MDAX to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to GEICO and other New York automobile insurers.

(v)    The Retail Defendants failed and/or refused to adequately respond to GEICO's proper requests for additional verification, thereby breaching a condition of coverage and relieving GEICO of any obligation to pay the fraudulent claims.

151.    Mirzakandov and MDAX made false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges that were not compensable under the No-Fault Laws, or that were far in excess of the charges that otherwise would be compensable under the No-Fault Laws.

152.    GEICO justifiably relied on the false and fraudulent representations made by Mirzakandov and MDAX, and as a proximate result has incurred damages of more than $208,000.00 based upon the fraudulent charges.

153.    The extensive fraudulent conduct of Mirzakandov and MDAX demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

154.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Mirzakandov and MDAX**
**(Unjust Enrichment)**

155.    GEICO repeats and realleges each and every allegation contained in Paragraphs 1 through 154 of this Complaint as if fully set forth at length herein.

156.    As set forth above, Mirzakandov and MDAX engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

157.    When GEICO paid the bills and charges submitted by or on behalf of MDAX for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Mirzakandov and MDAX.

158.    MDAX and Mirzakandov have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

159.    Retention of GEICO's payments by Mirzakandov and MDAX violates fundamental principles of justice, equity and good conscience.

160.     By reason of the above, the Mirzakandov and MDAX have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $208,000.00.

## FOURTH CAUSE OF ACTION
### Against the Shell Company Defendants
### (Aiding and Abetting Fraud)

161.     GEICO repeats and realleges each and every allegation contained in Paragraphs 1 through 160 of this Complaint as if fully set forth at length herein.

162.     The Shell Company Defendants knowingly aided and abetted the fraudulent scheme perpetrated on GEICO by the Retail Defendants.

163.     The acts taken by the Shell Company Defendants in furtherance of the fraudulent scheme include: (i) agreeing to operate with the sole purpose of assisting the Retail Defendants to perpetrate their fraudulent scheme; (ii) converting payments from the Retail Defendants into cash and returning a bulk of the monies to the Retail Defendants to support kickbacks to the wholesale companies and the Clinics; and (iii) converting payments from the Retail Defendants into cash and delivering a bulk of monies the directly to the Clinics to facilitate the kickback relationships between the Retail Defendants and the Clinics.

164.     The conduct of the Shell Company Defendants was a necessary part of and was critical to the success of the fraudulent schemes because without their actions, there would be no opportunity for the Retail Defendants to obtain the inexpensive DME and orthotic devices or the prescriptions they used to support their fraudulent claims.

165.     The Shell Company Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges for DME and orthotic devices that were not compensable under the No-Fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

166.    The conduct of the Shell Company Defendants caused GEICO to pay money based upon the fraudulent charges submitted through MDAX in an amount to be determined at trial, but in no event less than $208,000.00.

167.    The extensive fraudulent conduct of the Shell Company Defendants demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

168.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## JURY DEMAND

169.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.    On the First Cause of Action, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that MDAX has no right to receive payment for any pending bills submitted to GEICO, totaling an amount believed to exceed $472,000.00;

B.    On the Second Cause of Action against Mirzakandov and MDAX, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $208,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C.     On the Third Cause of Action against Mirzakandov and MDAX, more than $208,000.00, in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper

D.     On the Fourth Cause of Action against the Shell Company Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $208,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
       March 15, 2018

RIVKIN RADLER LLP

By: _____
       Barry I. Levy
       Michael A. Sirignano
       Justin A. Calabrese
926 RXR Plaza
Uniondale, New York 11556-0926
RR File: 5100-
Telephone:     (516) 357-3000
Facsimile:     (516) 357-3333

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company GEICO General Insurance Company and GEICO Casualty Company*

3851615 v3